# In the United States Court of Federal Claims

<table>
<tr><td>

**HII SHIPCYCLE, LLC,**

               *Plaintiff,*

**v.**

**THE UNITED STATES,**

               *Defendant,*

    **and**

**NORTHSTAR MARITIME
DISMANTLEMENT SERVICES, LLC,**

          *Defendant-Intervenor.*

</td><td>

No. 25-1336
(Originally Filed: February 19, 2026)
(Reissued: March 18, 2026)

</td></tr>
</table>

*Damien C. Specht*, *James A. Tucker*, *Victoria Dalcourt Angle*, *Thomas Lee*, Morrison & Foerster, LLP, Washington, D.C., for Plaintiff HII ShipCycle, LLC.

*Thomas J. Adair*, Trial Attorney, *Steven J. Gillingham*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brett A. Shumate*, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. *Samantha J. Hogue*, Attorney, Office of Counsel, Naval Sea Systems Command, Washington, D.C., of counsel.

*Luke W. Meier*, *Shane M. Hannon*, *Oliver E. Jury*, Blank Rome, LLP, Washington, D.C., for Defendant-Intervenor NorthStar Maritime Dismantlement Services, LLC.

## OPINION AND ORDER

**HADJI, *Judge*.**

This is a procurement protest involving the United States Department of the Navy's disqualification of the Protester, HII ShipCycle, LLC, from the competition for the dismantlement and disposal of a nuclear-powered aircraft carrier. The Protester alleges, among other things, that the Navy unreasonably denied its pre-deadline request for an extension of the Final Proposal Revisions (FPR) deadline. ECF 42 at 1-3; ECF 65 at 12-15. In its prayer for relief, the Protester requests a permanent injunction requiring the Navy to consider its FPR or permit it to resubmit its FPR and conduct a new evaluation. ECF 42

at 39. Pending before the Court are: (1) the Protester's Motion for Judgment on the Administrative Record (ECF 42); (2) the Government's Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record (ECF 47); (3) the Intervenor's Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record (ECF 46); (4) the Protester's Motion for Preliminary Injunction (ECF 5); (5) the Government's Motion to Supplement the Administrative Record (ECF 80) to include an email purporting to waive Source Selection Authority (SSA) appointment requirements; and (6) the Protester's Motion to Amend the Complaint (ECF 89) to add a count that the purported SSA lacked authority. For the reasons explained below, the Protester's Motion for Judgment on the Administrative Record is **GRANTED**, and the Government's and the Intervenor's Motions to Dismiss and Cross-Motions for Judgment on the Administrative Record are **DENIED**. Further, the Protester's Motion for Preliminary Injunction, the Government's Motion to Supplement the Administrative Record, and the Protester's Motion to Amend the Complaint are **DENIED**.[1]

## BACKGROUND

The Protester brings this procurement protest as a result of solicitation number N00024-25-R-4135 (the Solicitation) issued by the Department of the Navy. The Solicitation is for the dismantlement and disposal of the former USS *Enterprise*. AR 100. USS *Enterprise* was the Navy's first nuclear-powered aircraft carrier and is the first nuclear-powered aircraft carrier to undergo dismantling and disposal. AR 3. In 2012, the Navy deactivated USS *Enterprise*. AR 18. Then in 2017, the Navy decommissioned the ship and began working to establish a process with the Nuclear Regulatory Commission to govern appropriate disposal. AR 100. The Navy has removed its nuclear fuel, and the acquisition at issue will complete disposal of the ship. AR 100. The Navy is currently storing the ship at Huntington Ingalls Industries Newport News Shipbuilding in Newport News, Virginia. AR 100.

### I.    The Source Selection Authority

Because the estimated value of the acquisition exceeded $100 million, Navy regulations require the Agency head to appoint, in writing, an SSA that was distinct from the contracting officer. *See* AR 4-5 (noting the value of the procurement "exceeds $100 million" and the duties and responsibilities of the roles in the source selection are based on the DoD Source Selection Procedures).[2] The Administrative Record lists the SSA as Justin

---

[1] This Opinion was issued under seal on February 19, 2026. The parties were directed to propose redactions within 14 days of issuance of the Opinion. The Protester proposed redactions, but the Court did not find them warranted. The Court hereby publicly releases the Opinion in full.

[2] *See* Department of Defense Source Selection Procedures (August 20, 2022), ¶ 1.2, https://www.acq.osd.mil/dpap/policy/policyvault/USA000740-22-DPC.pdf ("For acquisitions with a total estimated value greater than or equal to $100 million (including options and/or planned orders), the Agency head shall appoint, in writing, an individual other than the Procuring Contracting Officer (PCO) as the

2

Meyer. AR 5. Mr. Meyer was purportedly appointed to this role, after the Solicitation was issued,[3] via an email exchange between Rear Admiral Casey Moton, the Program Executive Officer (PEO) for Aircraft Carriers, and Christopher Overton, the Director for Surface Ship Nuclear Propulsion (also known as Naval Reactors). AR 10276. The email, dated December 5, 2024, from Rear Admiral Moton to Mr. Overton stated:

> Chris,
>
> We plan to have Justin be the Source Selection Authority for this – given it's nature as a full and open competition, potentially lots of political, industry and public interest, and of course our first commercial disposal of a nuclear powered surface ship. The program of course will run the SSAC.
>
> I will obviously be involved plenty, but this also keeps me at the next layer up, in case there are any complications, so we would not have to go to [the Assistant Secretary of the Navy for Research, Development, and Acquisition].
>
> Any concerns with this plan?
>
> V/R
> Casey

AR 10276. Mr. Overton responded: "No concerns with your plan. I agree it makes a lot of sense having Justin be the SSA." AR 10276. The Government maintains that this purported appointment was valid. *See* ECF 74 at 2-3.[4]

---

Source Selection Authority (SSA)"). Adherence to the Department of Defense Source Selection Procedures is mandated by DFARS 215.300 through DFARSPGI 215.300.

[3] Approval of the source selection plan by the SSA is a prerequisite for issuing the solicitation. *See* FAR 15.303(b)(2); DFARS 215.303(b)(2).

[4] There appear to be several problems with the purported appointment. First, the email describes only a *plan* to appoint Mr. Meyer. Second, the Government cites authorities to support the purported appointment that are not signed by the Secretary of the Navy. Specifically, SECNAVINST 5400.15D, which purports to delegate the Secretary's acquisition authority to the Assistant Secretary of the Navy (Research, Development and Acquisition), was signed by Gregory J. Slavonic, the Assistant Secretary of the Navy (Manpower and Reserve Affairs), Performing the Duties of the Under Secretary of the Navy. SECNAVINST 5400.15D at 5. While there is a Navy Directives Manual that purports to permit the Under Secretary to sign directives on behalf of the Secretary, *see* SECNAV M-5215.1 at 1-1, ¶ 2.c, that manual was also signed by Mr. Slavonic, then serving as Acting Under Secretary of the Navy. *Id.* at iii. It is unclear how Mr. Slavonic, while serving as the Acting Under Secretary of the Navy or when performing the duties of the Under Secretary of the Navy, had the authority to delegate the Secretary's authority without any indication of approval by the Secretary. Similarly, Navy Marine Corps Acquisition Regulation Supplement (NMCARS) 5215.303(a) derives its authority from SECNAVINST 5400.15, a document not in the AR, which may have been canceled. *See* ECF 74 at 2-3. Third, assuming SECNAVINST 5400.15D is valid, it

## II.    The Solicitation and Initial Proposals

The Agency issued the Solicitation on October 1, 2024. ECF 47 at 11; *see also* AR 97-205. The Solicitation contemplated award of a firm-fixed price contract under FAR 15. *See* AR 175. It further provided that the Agency would evaluate proposals through conducting a best value tradeoff analysis, contemplating which proposal offered the best value to the Government. AR 311-12. The Agency included three evaluation factors, Factor 1: Technical/Management Approach, Factor 2: Past Performance Evaluation, and Factor 3: Total Evaluated Price. AR 311-12. The Agency assessed the Technical/Management Approach Factor for acceptability. AR 317. The Agency then considered which proposal represented the best value to the Agency in consideration of past performance and price. AR 317.

The Solicitation advised offerors that they must submit proposals through the Procurement Integrated Enterprise Environment (PIEE) website. AR 97. The Agency initially set the proposal submission deadline for January 6, 2025. AR 97. However, prior to the deadline, the Protester filed an agency-level protest challenging the terms of the Solicitation, then brought a substantively similar protest before the Government Accountability Office, *HII ShipCycle, LLC*, B-423265.1. AR 10000-21; AR 10022-50. In response, the Agency amended the Solicitation and extended the initial proposal deadline. *See* AR 272-318; 10051-56.

The Agency received three initial proposals. *See* AR Tabs 33, 34, 37. Of the three, the Agency found the Protester's and the Intervenor's proposals deficient and found the remaining proposal's price too high. AR 7866-68; 7871-72; 7878-80. As a result of the initial evaluation, the Agency determined the deficient proposals could be corrected, established a competitive range, and opened discussions.[5] AR 7866-68; 7871-72; 7878-80. Following discussions, the Agency set a deadline for FPRs of April 23, 2025, at 3:00 PM. AR 7869, 8057, 8059.

## III.    The Protester's FPR Submission

On the day of the FPR deadline, the Protester attempted to submit its FPR through PIEE but encountered several issues. *See* AR 9820-23; AR 9839. The Protester's employee, Danny Moretz, faced difficulties logging into PIEE and was ultimately locked out of the website twice. AR 9839. A second employee, Charles Dalrymple, successfully logged into PIEE via the Protester's account and began uploading the Protester's FPR documents. *See* AR 9800. Mr. Dalrymple observed that uploading the documents was taking a significant amount of time. AR 9798. In advance of the deadline, Mr. Dalrymple contacted the

_____

appoints the PEO for Aircraft Carriers as the SSA for his assigned acquisition programs, *see* Encl. 1, ¶ 6.c, and this appointment does not appear to be further delegable.

[5] The Court notes that the document titled "Competitive Range Memo," AR Tab 42, appears to be duplicative of AR Tab 103, "Memo to File." The Government appears to have inadvertently excluded the memorandum establishing the competitive range.

contracting officer at 2:14 PM and inquired if he was aware of any issues with PIEE. AR 9994, 9820. The contracting officer responded, "I had some issues with the landing page of the Solicitation module, but they were cleared up when I refreshed the page," and inquired whether Mr. Dalrymple was receiving an error message. AR 9820. In response, Mr. Dalrymple informed the contracting officer that the system was "just spinning." AR 9820. Eight minutes later, at 2:27 PM, Mr. Dalrymple again reported that the system was operating slowly and requested an extension. AR 9784. At 2:52 PM, the contracting officer received a notification through PIEE that the Protester had submitted its FPR. AR 9994. Mr. Dalrymple informed the contracting officer that the submission was not the Protester's complete FPR. AR 9994; ECF 41 at 12. The contracting officer did not respond to Mr. Dalrymple's 2:27 PM request for an extension but confirmed receipt of the Protester's partial FPR submission. *See* AR 9994.

At or about 9:41 PM, the Protester was able to complete submission of its full FPR. AR 9791. At 10:42 PM, the PIEE system notified the contracting officer that the Protester had submitted a late FPR. AR 9995. The following day, the Protester's counsel requested another deadline extension. AR 9791. In light of the Protester's late submission and prompting by the PIEE system, the contracting officer considered whether any exceptions to FAR 52.215-1(c)(3)(ii), the rule discussing consideration of late proposals, would be applicable to the Protester's submission. AR 9917-9919. The contracting officer also contacted the PIEE Program Management Office (PMO) and inquired if PIEE experienced any outages on April 23, 2025. AR 9843-44. The PMO concluded that no network outages impacted PIEE's functionality that day. AR 9834. Rather, the PMO suggested the Protester's challenges could be attributed to user error or localized network errors. AR 9836-37.

## IV.    Elimination of the Protester, Contract Award, and Litigation

The contracting officer made the determination to eliminate the Protester from the competition on May 30, 2025, explaining "[because] of the Navy's schedule requirements and investigation of the facts regarding ShipCycle's untimely FPR submission," accepting the Protester's FPR would unduly delay the acquisition. AR 9918-19.[6] The contracting officer further determined that granting a post-deadline extension would violate the FAR and that none of the exceptions to the late-is-late rule were applicable to the Protester's submission. AR 9918-19. Because the contracting officer eliminated the Protester from the competition, the Agency did not evaluate the Protester's timely submitted partial FPR or the apparently complete version of the FPR submitted after the deadline. AR 9925. That same day, the Agency awarded the contract to the Intervenor, NorthStar. AR 9925. The

---

[6] The AR indicates that the document eliminating the Protester from the competition was executed solely by the contracting officer. *See* AR 9919. This appears to contradict the Department of Defense's requirement that the SSA approve the "written determination of the competitive range or elimination of an offeror previously determined to be in the competitive range." Department of Defense Source Selection Procedures (August 20, 2022), ¶ 1.4.1.2.7.

Protester then filed a protest with the Agency on June 9, 2025, challenging the Protester's elimination. AR 9937-52. The Agency denied the protest on July 8, 2025. AR 9993-99.

On August 11, 2025, EnergySolutions Federal Support, LLC, appearing derivatively on behalf of the Protester, initiated this action by filing a Complaint and Motion for Preliminary Injunction in this Court. ECF 1; ECF 5. The Intervenor filed an unopposed Motion to Intervene on August 14, 2025, ECF 15, which the Court granted the next day, ECF 17. On September 26, 2025, EnergySolutions amended its Complaint, ECF 41, and moved for Judgment on the Administrative Record. ECF 42. In response, the Government and the Intervenor moved for dismissal and cross-moved for Judgment on the Administrative Record. ECF 47; ECF 46. On October 29, 2025, the Court granted a Motion to Substitute the Protester in place of EnergySolutions. *See* ECF 58.[7] The Court heard oral argument on October 30, 2025. On November 13, 2025, the Court ordered supplemental briefing. ECF 64. The parties filed their supplemental briefs on November 21, 2025. ECF 65; ECF 66; ECF 67. On December 1, 2025, the Court ordered the Government to supplement the Administrative Record to include the appointment of the Source Selection Authority. ECF 71. The Government filed a response to the Court's order and filed the supplement to the Administrative Record on December 4, 2025. ECF 74; ECF 75. On December 18, 2025, the Government moved to supplement the Administrative Record. ECF 80. Following the Government's Motion, the Protester moved to amend the Complaint on December 31, 2025. ECF 89.

## LEGAL STANDARDS

### I.   Procurement Protest Jurisdiction and the Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act 1996, 28 U.S.C. § 1491(b), confers jurisdiction on this Court to render judgment on "an action by an interested party objecting to … the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

The Court reviews a procurement protest action under the standards set forth in Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4); *see NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed. Cir. 2004) (stating that APA standard of review is applicable to procurement protests). The APA provides that an agency's decision is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). "The arbitrary and capricious standard applicable here is highly deferential," and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir.

---

[7] Counsel for EnergySolutions continued to represent the Protester. The Protester then filed an Amended Complaint, ECF 59, that raises identical protest grounds as the previous Amended Complaint, ECF 41.

2000) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). In reviewing procurement decisions, the Court should not substitute its judgment for the agency's. *See R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003). Instead, the Court fulfills its judicial function "by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority,' … and ensuring the agency has engaged in 'reasoned decisionmaking.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395-96 (2024) (citation omitted).

## II.    Judgment on the Administrative Record in a Procurement Protest

Court of Federal Claims Rule 52.1(c) provides for judgment on the administrative record. Rule 52.1(c) was "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

To prevail on a procurement protest, a plaintiff must demonstrate either: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "When a challenge is brought on the first ground, the courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Id* (internal quotation marks and citation omitted). "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332-33 (internal quotation marks and citations omitted). If an error is found in the procurement, the APA instructs that "due account shall be taken of the rule of prejudicial error," which the Court determines as a factual matter. 5 U.S.C. § 706; *see Bannum*, 404 F.3d at 1351.

## DISCUSSION

This section is divided into four parts. Part I addresses jurisdiction. Part II addresses the heart of the protest: whether the Agency's failure to consider the Protester's pre-deadline extension request was arbitrary and capricious.[8] Part III addresses whether this failure was prejudicial. Part IV addresses whether the Protester's proposed remedy—to enjoin the Navy from continuing performance of the Intervenor's contract and to require the Navy to consider its FPR—is appropriate.

---

[8] The Protester also argues: (1) that the Agency should have applied the "government control exception" to the late-is-late rule, and consequently, reviewed its proposal, ECF 42 at 25-32; and (2) that the Agency should have considered its proposal because its challenges with proposal submission were a result of technical issues with PIEE, ECF 42 at 32-35. The Court does not address these as they are not dispositive.

## I.    Jurisdiction

The Protester alleges jurisdiction under 28 U.S.C. § 1491(b). ECF 59 at 2. Because the Protester is an actual offeror whose direct economic interest was affected by the Navy's award of the contract to the Intervenor,[9] the Protester is an "interested party" under 28 U.S.C. § 1491(b) and the Court has jurisdiction to hear this matter. *See* 28 U.S.C. § 1491(b)(1); *Percipient.AI, Inc. v. United States*, 153 F.4th 1226, 1235 (Fed. Cir. 2025) (en banc) ("We have long held that the term 'interested party' for bid protests should be limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

## II.    Failure to Consider the Pre-Deadline Extension Request

This procurement was a best value tradeoff source selection among three offerors selected for the competitive range. AR 9890-91. In that context, the Protester argues that the contracting officer's failure to consider its pre-deadline extension request for its FPR submission amounts to an abuse of discretion because: (1) the Protester was only seeking a short extension in light of IT issues it was having with the Agency's electronic proposal submission platform, which was the only method of proposal submission permitted by the Solicitation; (2) the Protester's initial proposal received the highest non-price factor rating available (as did the Intervenor); (3) and the Protester's price was approximately $100M below the Intervenor's price. ECF 42 at 18.

The Court will defer to a contracting officer's decision "unless the action does not 'evince[] rational reasoning and consideration of relevant factors.'" *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Advanced Data Concepts*, 216 F.3d at 1058). "[I]t is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)). When an agency decision "entirely fail[s] to consider an important aspect of the problem," the agency's decision may not "pass muster under the arbitrary and capricious standard." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 56 (1983).

In the specific context of source selections, there is compelling precedent for finding agency actions are arbitrary and capricious when, like here, an agency does not consider relevant factors. In *BCPeabody Construction Services, Inc. v. United States*, the Court found the contracting officer's decision to not seek clarifications was irrational because the contracting officer failed to consider relevant factors, which could have resulted in the agency making award at a significantly lower price. 112 Fed. Cl. 502, 512-13 (2013).

---

[9] The Government and the Intervenor do not challenge the Court's jurisdiction on these grounds. Although the Government and the Intervenor filed motions to dismiss on jurisdictional grounds, these motions challenged the ability of this matter to be brought by EnergySolutions Federal Support, LLC as a derivative suit. *See* ECF 47 at 20-29; ECF 46 at 10-21. This issue is moot because the Court granted the Motion to Substitute the Protester in place of EnergySolutions. *See* ECF 58.

Similarly, in *Level 3 Communications, LLC v. United States*, the Court found a contracting officer's failure to seek clarifications was irrational where a protester's proposal contained a clerical error but was $38.6 million less than the awardee's price. 129 Fed. Cl. 487, 505 (2016). In that case, the Court deemed the price difference between the awardee and the protester an "important aspect of the problem" that was unreasonable for the contracting officer to fail to consider.[10] *Level 3*, 129 Fed. Cl. at 507.

Here, as in *Level 3*, the Protester's initial evaluation and the Agency's decision to include the Protester in the competitive range amounted to important aspects of the problem that the contracting officer had an obligation to consider in order to make a reasonable decision. *Id.* (citing *State Farm*, 463 U.S. at 43). Specifically, the contracting officer was aware of the price disparity between the Protester and the Intervenor, that the Protester and the Intervenor had the same non-price rating of "Substantial Confidence," and that the procurement was to be conducted on a best value basis.[11] Further, when the Protester emailed the contracting officer before the deadline requesting an extension, the Agency had already made a competitive range determination, meaning the contracting officer knew the Protester had received the highest possible rating for past performance and that its proposal had only minor issues under the technical factor. *See* AR at 7851-52. Further, the contracting officer knew the Protester's initial proposed price was about $100 million less than the Intervenor's. AR 7856. Yet, despite the contracting officer's awareness of these facts, nothing in the AR indicates he considered these "important aspect[s] of the problem" when he was unresponsive to the Protester's pre-deadline extension request. *See State Farm*, 463 U.S. at 43. Indeed, nothing in the AR demonstrates that the contracting officer considered the Protester's pre-deadline extension request at all.

Beyond the contracting officer's knowledge of the initial proposals, his communications with the Protester preceding the deadline further reflect relevant factors that he failed to consider. The Protester sent an email to the contracting officer at 2:14 PM explaining that it was having issues with the submission platform. AR 9784. The Protester

---

[10] Both *BCPeabody* and *Level 3* concerned proposals evaluated on a lowest price technically acceptable basis (LPTA), not a tradeoff process. *See BCPeabody*, 112 Fed. Cl. at 512-13; *Level 3*, 129 Fed. Cl. at 505. Nonetheless, both cases are instructive. Strictly speaking, both the tradeoff process and the LPTA process are on the best value continuum, *see* FAR 15.101, but the tradeoff process is often referred to as a "Best Value" process as it was in the Solicitation. Under the circumstances of this competition, where the Solicitation stated, "[t]he importance of the Price as an evaluation factor will increase with the degree of equality in overall technical merit (non-price factors) of competing proposals," AR at 205, and all offerors received the highest non-price rating, there is little to distinguish the two processes. As such, the Court finds that the tradeoff process in the Solicitation is almost entirely akin to LPTA process. Under both processes, the obligation on the contracting officer to make rational decisions in light of knowledge about a protester's proposal is still applicable. Further, *BCPeabody* and *Level 3* go a step further than the Court does here by requiring the contracting officer to have engaged in a particular action as opposed to the more general requirement that the contracting officer have considered the request.

[11] In this case, the potential price difference before the contracting officer was $100 million, which is substantially more than the $1 million and $38.6 million differences in *BCPeabody* and *Level 3*, respectively. *BCPeabody*, 112 Fed. Cl. at 512-13; *Level 3*, 129 Fed. Cl. at 505.

and the contracting officer then engaged in subsequent communications establishing that the Protester's issues with the submission platform were persisting, leading to the Protester's pre-deadline extension request at 2:27 PM. AR 9784. By 2:27 PM, the contracting officer was aware that the Protester was likely unable to meet the deadline. AR 9994. The contracting officer did not respond to the extension request. The Court does not recount these facts to suggest the contracting officer was *required* to grant an extension under these circumstances. To be sure, the Court does not endeavor to displace the Agency's judgment with its own. *See State Farm*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."). But here, the contracting officer knew of the Protester's technological difficulties, knew the contents of the initial proposals, and failed to ever acknowledge the Protester's request, even in later documented decisions. That does not reflect consideration of factors relevant to the procurement. Consequently, the contracting officer's failure to consider the request was arbitrary and capricious. *Savantage*, 595 F.3d at 1286; *Level 3*, 129 Fed. Cl. at 507.

The Government and the Intervenor raise six main arguments to try to explain away the contracting officer's failure to even consider the Protester's pre-deadline extension request. None of these arguments are compelling.

First, at oral argument, the Government stated that the contracting officer did not have authority to grant the request and ostensibly did not have time to obtain approval from the appropriate authority (the Intervenor conceded that the contracting officer did have the authority to grant the request). ECF 61 at 30; ECF 61 at 106. In alleging that the contracting officer did not have authority to extend the deadline, the Government appears to argue that, according to the Department of Defense Source Selection Procedures for Acquisitions over $100 Million, the contracting officer could not independently grant or deny the extension request. ECF 61 at 30. Yet, the Government's position on this matter is not supported by the text of the Source Selection Procedures. The procedures do not explicitly limit the contracting officer's authority in such a way that he could not grant the request. *See* Department of Defense Source Selection Procedures (August 20, 2022) ¶ 1.4.2. Further, the responsibilities listed for the contracting officer in the DoD Source Selection Procedures are "[i]n addition to responsibilities listed in FAR 15.303(c)." *Id.* at 1.4.2.2. FAR 15.303(c) explicitly authorizes contracting officers to "control exchanges with offerors in accordance with 15.306," which is broad language that would encapsulate administrative functions like setting and changing deadlines for exchanges after establishment of the competitive range. Accordingly, the Court is unpersuaded by the Government's argument that the contracting officer lacked the authority to provide an extension to the deadline.

Second, the Government and the Intervenor argue that granting a last-minute request would be tantamount to a post-deadline extension, which is barred under *Geo-Seis Helicopters, Inc. v. U.S.*, 77 Fed. Cl. 633 (2007). ECF 46 at 37; ECF 47 at 48. But *Geo-Seis* said nothing about pre-deadline extensions. *Geo-Seis*, 77 Fed. Cl. at 645-46 (holding

that an extension given after the submission deadline would circumvent the "late-is-late" rule). Here, even under *Geo-Seis*, an extension *could* have been given before the deadline because nothing in *Geo-Seis* bars pre-deadline extension requests. *Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 134, n.7 (2015) (distinguishing *Geo-Seis* in a case where the contracting officer granted a pre-deadline extension). If the extension were made prior to the deadline and given to all offerors, then the reasoning and concern espoused in *Geo-Seis* would not be at issue. *Geo-Seis*, 77 Fed. Cl. at 645-46.

Third, the Government contends that the 33-minute window the contracting officer had to consider the request was insufficient to go through the process of extending the deadline and amending the Solicitation before the deadline lapsed. ECF 47 at 47. The Court disagrees and finds no basis in the AR for such a conclusion. The time the contracting officer had was sufficient to send an email, that need not have been longer than one sentence, to the three offerors extending the deadline. To the extent the contracting officer lacked sufficient time to send a short email, there is no contemporaneous document in the AR memorializing such a conclusion. For example, there is no email from the contracting officer to the Protester stating that he did not have enough time to consider such a request or an email from the contracting officer to someone else in the Government stating the same. There is not even a memorandum for the record or any other type of after-the-fact document explaining that lack of time was a reason not to grant the extension. The Government's offered justification is nothing more than *post hoc* attorney argument that the Court finds unpersuasive. With respect to the Government's argument that the contracting officer did not have time to issue a formal amendment to the Solicitation, the court is similarly unpersuaded. There is no requirement that an extension be issued by modification to the Solicitation, and to the extent such a requirement exists, failure to follow such a requirement is not prejudicial as this Court explicitly concluded in *Guardian Moving*, 122 Fed. Cl. at 134.

Fourth, the Government and the Intervenor allege that the Intervenor would have been prejudiced if the Agency had extended the deadline. ECF 47 at 47-48; ECF 61 at 107-10. This is not so. The contracting officer reasonably could have extended the deadline for *all* offerors. *Guardian Moving*, 122 Fed. Cl. at 134 (finding protester not prejudiced where the agency notified all offerors of the extension via email). It would be entirely reasonable for the contracting officer to have extended the deadline for all three offerors and afforded all offerors the opportunity to modify and resubmit their FPRs. *Id.* Therefore, the Intervenor would have suffered no prejudice.

Fifth, the Intervenor contends that an offeror's decision regarding the appropriate time to submit their proposal is entirely a business decision that should be left to the offerors. ECF 61 at 104-06. While this proposition on its own is true, it does not relieve an agency of its obligation to act reasonably and to consider factors that may affect a procurement. *See Savantage*, 595 F.3d at 1286.

Finally, at oral argument, counsel for the Intervenor argued that if the Court were to find that the Agency should have considered the Protester's pre-deadline extension request,

11

then he would broadly encourage future clients to request an extension prior to all proposal submissions, regardless of whether an extension was actually needed. ECF 61 at 65-68. Put differently, counsel for the Intervenor insinuated that he will advise his clients to act in bad faith to pressure agencies to grant extensions. The Court is unpersuaded that contractors would act in bad faith and disingenuously request unneeded extensions. Regardless, such a scenario does not prevent an agency from denying a request if it has a rational reason to do so—a business risk assumed by the contractor. Here, the Agency's failure is that it did not even *consider* the request. That is not rational.

In sum, the AR indicates that there was a potential rationale for granting the Protester a short extension—keeping a highly-rated proposal at a price well below the Intervenor's price in a best value procurement—and no documented rationale for denying an extension. As such, based on the AR before the Court, and considering the context in which the request was made, the contracting officer's failure to consider the Protester's pre-award deadline extension request was arbitrary and capricious.

## III.    Prejudice

Having found the Agency's actions to be arbitrary and capricious, the Court must determine whether the Agency's conduct prejudiced the Protester. 5 U.S.C. § 706(2)(A); *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996-97 (Fed. Cir. 2021). In the context of procurement protests, the Federal Circuit describes "prejudice" as a requirement that a protester show a "substantial chance of award" to prevail. *See Sys. Stud. & Simulation*, 22 F.4th at 998; *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013).

Here, the Protester alleges that because of its high past performance rating and lower price, it had a substantial chance of receiving contract award. ECF 42 at 35. The Court agrees. Had the contracting officer acted reasonably in light of the information available to him, the Protester would have had a substantial chance of receiving the contract because of its inclusion in the competitive range, its receipt of the highest non-price rating of "Substantial Confidence" (the same as the Intervenor), and a price that was approximately $100M below the Intervenor's price.

## IV.    Injunctive Relief

The Protester has requested a permanent injunction and bid and proposal costs. ECF 59 at 25-26. The Government argues against a permanent injunction. ECF 47 at 50. It requests a stay and remand should the Court find in favor of the Protester on the merits. ECF 47 at 50.

In determining whether to grant injunctive relief, the Court must consider "whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)

(citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)). For the reasons below, the Court finds that limited injunctive relief is appropriate. As the Protester has succeeded on the merits, the Court turns to the remaining three factors.

First, injunctive relief is necessary to prevent the Protester from being irreparably harmed. Here, the Protester has lost the opportunity to compete. *RLB Contracting Inc. v. United States*, 118 Fed. Cl. 750, 761 (2014), *aff'd*, 621 F. App'x 1026 (Fed Cir. 2015) ("[I]n the context of a bid protest, the loss of an opportunity to compete for an award for which a party would not otherwise be disqualified is sufficient injury to warrant injunctive relief."). Further, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 582 (2013) (quoting *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993)). As the Protester was not considered for contract award, there is no adequate alternative remedy absent injunctive relief to require consideration of the Protester's FPR. The Government's proposal of simply ordering a stay and remand does not provide adequate relief because it would permit the Agency to lift the voluntary stay of contract performance by the Intervenor that it implemented following filing of this action (to avoid litigating a preliminary injunction) or otherwise not consider the Protester's FPR, resulting in irreparable harm to the Protester.

Next, the Court must balance the potential harm to the plaintiff of not granting the injunction against the potential harm to the Agency and the Intervenor. Considering this, the Court concludes that the Government and the Intervenor will not be harmed beyond typical costs and delays associated with an injunction. This harm does not outweigh the harm experienced by the Protester. *See 22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 402 (2025) ("[T]he harm to the Agency of having to reconsider a procurement in a fair and rational way does not outweigh the harm to an individual organization that was denied its right to fair consideration.").

Turning to the final factor, "[t]he public interest is well-served by ensuring that the government procurement process is fair and even-handed. *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004), *aff'd*, 389 F.3d 1219. Allowing the Agency to conduct a rational competition is in the public interest. The public does not have an urgent need for the dismantlement of a decommissioned ship and faces minimal risk of harm from a delay.

Having determined that injunctive relief is appropriate, the Court turns to the exact scope of relief. At this point, the Agency cannot retroactively grant the Protester's pre-deadline request to put the parties in the same place they would have been but for the Agency's errors. The next best thing the Court can do, consistent with its authority under 28 U.S.C. 1491(b)(2), is remand the matter to the Agency and require that the offerors in the competitive range be given the opportunity to submit revised proposals under a new FPR deadline. By the same rationale, the Court will enjoin the Agency from commencing performance of the contract awarded to the Intervenor under the Solicitation, as further explained below.

Regarding bid and proposal costs, because the Court is remanding this matter to the Agency for further proceedings, the Protester will have an opportunity to have its FPR considered by the Agency. Therefore, such relief is not appropriate. *See Beta Analytics Int'l, Inc. v. United States*, 75 Fed. Cl. 155, 159 (2007) ("A reevaluation restores to a victim of arbitrary and capricious procurement activity its substantial chance to receive the contract award, [which typically eliminates] the basis for an award of bid preparation and proposal costs, as the investment in the proposal is no longer a 'needless expense,' and the bidder may yet see the fulfillment of the promise of 'fair and impartial consideration' which 'induced it to spend its money to prepare its bid.'" (quoting *Heyer Products Co. v. United States,* 135 Ct. Cl. 63, 69, 71 (1956))).

## CONCLUSION

For the foregoing reasons, the Protester's Motion for Judgment on the Administrative Record is **GRANTED**. The Government's and the Intervenor's Motions to Dismiss and Cross-Motions for Judgment on the Administrative Record are **DENIED**. The Protester's Motion for Preliminary Injunction (ECF 5), the Government's Motion to Supplement the Administrative Record (ECF 80), and the Protester's Motion to Amend the Complaint (ECF 89) are also **DENIED**.[12]

Pursuant to RCFC 52.2, the case is **REMANDED** for **60 days** to the Agency for further proceedings. The Agency is **ORDERED** to afford the three offerors in the competitive range the opportunity to resubmit FPRs and to make a new source selection decision based on the FPRs. The Agency may, in the alternative, cancel the Solicitation or take other action consistent with this Opinion. It is further **ORDERED** that within **60 days**, the parties shall file either a stipulation of dismissal or a joint status report describing the Agency's decisions on remand and proposing further proceedings in this case. This case shall be **STAYED** for **60 days**. The Agency is **ENJOINED** from commencing performance of the contract awarded to the Intervenor under the Solicitation absent further order of the Court or a joint stipulation of dismissal is filed. The **CLERK** is **DIRECTED** to serve a certified copy of this order on the Department of the Navy, c/o James F. McGowan, Procuring Contracting Officer, Naval Sea Systems Command, 1333 Isaac Hull Avenue S.E., Washington, D.C. 20376. *See* Rule 52.2(b)(2).

**IT IS SO ORDERED.**

PHILIP S. HADJI
Judge

---

[12] The Protester's Motion for Preliminary Injunction (ECF 5) is moot given this decision. Further, because the Court is remanding to the Agency on other grounds, the Court finds that justice would not be served by further developing the record by granting the Government's Motion to Supplement the Administrative Record (ECF 80) and the Protester's Motion Amend the Complaint (ECF 89). The parties are free to raise these issues again after remand, if they deem it appropriate to do so.